UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

DAVID SCOTT HARRISON,

        Plaintiff,

    v.

S. KERNAN, et al.,

        Defendants.

Case No. 16-cv-07103-NJV

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT

Re: Dkt. Nos. 23, 27

      This is a civil rights case filed pro se by a state prisoner which concerns the decision-making process in regard to the distribution of personal property in institutions run by the California Department of Corrections and Rehabilitation ("CDCR"). Pending before the court are the parties' cross motions for summary judgment. For the reasons discussed below, the court will grant Defendants' motion and deny Plaintiff's motion.

      Plaintiff David Scott Harrison filed his complaint in the Superior Court of California, County of Marin, alleging that CDCR Secretary Kernan and his predecessor Secretary Beard were discriminating against him based on his male gender by not allowing him to purchase vendor products available to female inmates. (Doc. 1-1.) On December 13, 2016, Defendants removed this action to federal court. (Doc. 1.) In screening the complaint pursuant to 28 U.S.C. Section 1915A, this court recognized one cognizable claim, an equal-protection violation under the Fourteenth Amendment, specifically that Defendants have imposed personal property requirements on Harrison that are disparate from those imposed on similarly-situated female inmates of the same, and greater, security risk classifications. (Doc. 13.) The court found that Plaintiff "claims equal protection violations in the decision making process by which the CDCR

provides favored treatment to female inmates as compared with male inmates, for no reason other than gender." (Doc. 13, 3:6-8.) The court found that Plaintiff's allegations were sufficient to state a colorable claim for a violation of the right to equal protection of the law. *Id.* at 8-10.

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id*.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Id.*; *Celotex Corporation v. Catrett,* 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50. However, "self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory." *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001); *see also Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (in equal protection case, conclusory statement of bias not sufficient to carry nomoving party's burden).

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).2 "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *In re Oracle*

*Corporation Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 252). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323. At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014); *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.; Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1028-29 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of material fact, a district court may grant summary judgment if the opposing papers do not include or conveniently refer to that evidence). Although the district court has discretion to consider materials in the court file not referenced in the opposing papers, it need not do so. *Id.* at 1029. "The district court need not examine the entire file for evidence establishing a genuine issue of fact." *Id.* at 1031.5

When the parties file cross-motions for summary judgment, the district court must consider all of the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party. *The Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001).

It lies within the district court's discretion whether to allow a party to raise on summary

judgment new arguments that have no basis in the complaint. *See Brass v. County of Los Angeles*, 328 F.3d 1192, 1197-98 (9th Cir. 2003) (upholding district court's finding that plaintiff waived new § 1983 arguments raised for the first time in his motion for summary judgment where nothing in the counts in the amended complaint suggested he was raising those arguments and he offered no excuse or justification for his failure to raise them earlier).

**UNDISPUTED FACTS**

## I. The Parties

Plaintiff David Scott Harrison is incarcerated in the custody of the CDCR and is housed at San Quentin State Prison (San Quentin.) (Doc. 24, Declaration of Capt. G. Bickham (Bickham Decl.) at ¶ 20.)

Defendant S. Kernan is CDCR's Secretary, and he serves as the Chief Executive Officer, overseeing all executive level operations for the department. (Cal. Code Regs. tit. 15, § 3000; Bickham Decl. ¶ 4.)

Defendant J. Beard is Defendant Kernan's predecessor as CDCR Secretary. (*Id.*)

The Secretary of CDCR does not engage in any day-to-day institutional operations pertaining to property regulations. (*Id.*)

## II. Regulations Affecting Personal Property

CDCR's Division of Adult Institutions, Standardized Procedures Unit, oversees and regulates all provisions regarding inmate property. (Bickham Decl. ¶ 4.).

The California Code of Regulations, Title 15, determines the personal property that may be purchased by inmates at the inmate's expense. (Bickham Decl. ¶ 5, Ex. A.) Personal property schedules, which specify the kind and quantity of personal (*i.e.* not state-issued) property that inmates may purchase and possess are incorporated by reference into Title 15, Section 3190(b). The personal property schedules are periodically revised to enhance institutional safety and security. *Id.*

In addition, CDCR's Department Operations Manual provides detailed matrices, also known as Authorized Personal Property Schedules, strictly regulating the personal property items that inmates are allowed to possess. (Bickham Decl. ¶ 6, Exs. B, C.) The type and quantity of

1    allowable items for any particular inmate vary based on the institution where the inmate is housed

2    and the privilege group to which the inmate belongs. (*Id*.)

3         The approved Authorized Personal Property Schedules for inmates were formulated by

4    prison officials based on various factors, the first and foremost of which is safety and security.

5    (Bickham Decl. ¶ 7.) There are a total of four Authorized Personal Property Schedules developed

6    for the standardization of inmate personal property throughout the state, which establish

7    allowable property by the security levels and privilege groups. (*Id*., Ex. C.)

8         Because of institutional safety and security concerns, CDCR strictly regulates the type and

9    quantity of personal property that inmates can purchase or possess. (Bickham Decl. ¶ 8.)

10   Membership in particular privilege groups is required for inmates to have access to the canteen

11   and the quarterly package program, including frequency. (*Id*.) The California Code of

12   Regulations governs inmates' privilege-group classification based on a variety of factors. Cal.

13   Code Regs. tit. 15 § 3044 (2012). Inmates with multiple disciplinary violations, for example,

14   may be placed in a privilege group with no access to the canteen or the quarterly package

15   program, whereas successfully programming inmates will enjoy more expansive access to such

16   privileges.  *Id*.

17        Inmates in the highest privilege groups are still subject to significant restrictions on items

18   they may purchase in their quarterly packages, based on institutional safety and security concerns.

19   (Bickham Decl. ¶ 9.) This is because inmates live in settings and circumstances where several

20   other inmates may have access to other inmates' property. (*Id.*) Therefore, even if an inmate is

21   deemed to be in the privilege group requiring the least security oversight, his items will still be

22   limited based on his current housing, specifically to ensure that other inmates do not gain access

23   to items that can be used illegally. (*Id*.)

24        The Authorized Personal Property Schedules are constantly revised to reflect the safety and

25   security needs of CDCR facilities. (Bickham Decl. ¶ 10.) For instance, the Authorized Personal

26   Property Schedules were recently revised to provide incentives for inmates that behave in a

27   positive manner. (*Id*.) The schedules have also been revised based on evolving changes or trends

28   in inmates' use of personal property items as weapons stock. (*Id*.) The correctional grounds on

5

which the personal property schedules are based include, but are not limited to: (1) increasing staff's ability to detect contraband, drugs, and weapons; (2) reducing inmates' ability to barter or trade; (3) reducing inmate personal property claims; (4) providing property distinctions for the five mission-based programs; (5) reducing inmates' ability to intimidate other inmates into relinquishing personal property; and (6) institutional security and safety. (Bickham Decl. ¶ 11.) The personal property allowed to inmates is also based, in part, on each institution's mission, which is directly related to the institution's security level. (Bickham Decl. ¶ 12.) CDCR weighs institutional safety concerns against inmates' needs and property desires to determine reasonable personal property standards. (*Id.*) And personal property schedules are different at each of CDCR's 34 institutions because of each institution's unique space requirements and security considerations. (*Id.*)

The Authorized Personal Property Schedules have distinctive differences based on security risks. (Bickham Decl. ¶ 13.) The Authorized Personal Property Schedules allow or restrict property based on privilege groups. (*Id.*) For example, male Reception Center inmates designated as "Intake" inmates are allowed property items different from male Reception Center inmates designated as "Processing." (*Id.*) Likewise General Population male inmates at correctional Levels I, II, and III, and designated as Privilege Groups "A", "B" and "C", all differ from one another. (*Id.*) For instance, Level IV male General Population inmates' property allowances differ when at Levels I, II, and III. (*Id.*)

The Authorized Personal Property Schedules differ even further when considering segregated inmates. (Bickham Decl. ¶ 14.) Property allowed to inmates designated as Administrative Segregated inmates is different from Security Housing Unit inmates. (*Id.*) The differences are not based on gender, but based on security threat levels. (*Id.*) Generally, inmates housed in administrative segregation or Security Housing Units have committed an act of violence, been the victim of an act of violence, or engaged in conduct detrimental to the safety and security of the institution, such as prison gang activity. (*Id.*) These inmates therefore are considered to have an additional propensity towards violence and crime and thus have greater property restrictions than other inmates. (*Id.*)

6

The Authorized Personal Property Schedules provide for different property at male and female institutions because of the distinct and unique security needs and considerations that distinguish these institutions. (Bickham Decl. ¶ 15.) The Authorized Personal Property schedules, historically and recently revised, also address issues specific to female offenders such as personal hygiene items only necessary for females. (Bickham Decl. ¶ 16.)

The property matrices do not similarly restrict certain property items at women's institutions because CDCR has determined that fewer acts of violence occur at those prisons than at men's prisons, including San Quentin. (Bickham Decl. ¶¶ 17 - 18, Ex. D.) It is a statistical fact male inmates are more prone to violence than their female counterparts. (Bickham Decl. ¶ 17, Ex. D) Items are not necessarily restricted from male inmates, but from certain facilities or institutions due to the propensity for violence of inmates housed at a given institution. (*Id.*) In additional, female offenders are less of an escape risk. (*Id.*) Specifically, COMPuter STATistics (COMPSTAT) data for 2015 show that inmates at male institutions commit weapons offenses at twice the rate of inmates at female institutions (1.25 per capita for males and .66 per capita for females). (Bickham Decl. ¶ 18, Ex. D.) Additionally, the National Gang Crime Research Center has determined that "the prison gang problem remains mostly a male problem, with female inmates having a significantly lower gang density rate." (Bickham Decl. ¶ 19.) Thus, items allowed to female inmates are not necessarily restricted from male inmates, but may be disallowed at certain facilities or institutions due to the propensity for violence of inmates housed at a given institution. (Bickham Decl. ¶ 17.)

**III.  Specific Disallowed or Restricted Items**

Specific items are disallowed at male institutions because of the threat they pose to the safety and security of institutions. For example, no male inmate housed at San Quentin is permitted to purchase certain items with a substantial sugar content, such as ketchup, jams, jellies, honey, syrup, fruit, juice, or dried fruit. (Bickham Decl. ¶ 24.) Inmates combine these sugar based products with bread and water to make an illegal alcoholic beverage called "pruno." (*Id.*) Fermentation can occur in as little as three days when the ingredients are sealed in a plastic bag and kept warm, and as with any alcoholic beverage, a person who consumes it eventually will

become intoxicated. (*Id.*) Pruno has been shown to play a significant role in inmate aggression against other inmates and correctional staff, increasing the incidence of violence and antisocial behaviors among inmates. (*Id.*) CDCR regulations do not permit inmates to possess or consume alcohol. (Bickham Decl. ¶ 25.) Even with the restrictions on processed, sugar-based products and disciplinary measures imposed on inmates found to possess pruno, inmates still find ways to make pruno by using, for example, fresh fruit. (Bickham Decl. ¶ 26.) COMPSTAT data conclusively shows that despite CDCR's efforts, male inmates use these ingredients to manufacture pruno in significantly greater numbers than is observed in female institutions. (Bickham Decl. ¶ 25.) The restrictions on sugar-based products are critical for reducing the volume of pruno made at San Quentin and for lowering the number of pruno-related violent incidents, which in turn enhances institutional safety and security for all inmates and staff. (Bickham Decl. ¶ 26.)

Nevertheless, male inmates (including San Quentin inmates and Harrison) are allowed to purchase sugar-free sweetened products. (Bickham Decl. ¶ 27.)

Similarly, the hair products Harrison requests are disallowed because they contain metal or metal pieces. (Bickham Decl. ¶ 28.) Harrison also complains of restrictions on items for purchase specifically, rubber bands, curling irons (electric), hair dryers, hair clips/claws, razors, styling sprays. (Pl.'s Compl., Doc. 1-1.) But COMPSTAT Data shows that male inmates use any metal pieces, large or small, to manufacture weapons that threaten the safety and security of the inmates, staff, and the institutions. (Bickham Decl. ¶¶ 28-29.) Other items disallowed because of their potential to serve as weapons, weapons tools, or weapons stock include battery clocks, hangers, immersion heaters, body sprays, hair clips, and metal tweezers. (Bickham Decl. ¶ 32.)

Harrison complains of restrictions on hair products and hygiene items, specifically Nexxus hair products, brush, olive oil mousse, dark & lovely hair color, Nivea lotion, Suave body wash, tweezers, St. Ives body scrub, St. Ives lotions, age-defying cream, deodorant, cotton balls, Q-tips, styling sprays. (Pl.'s Compl., ECF No. 1-1.) But Harrison's allegation that he has been denied access to these items is factually incorrect, as male inmates are allowed to purchase cotton swabs,

8

lotions, deodorants and other personal hygiene per the Authorized Personal Property Schedule. (Bickham Decl. ¶ 31, Ex. C at 6-24.) Because male and female inmates have different hygiene needs, the matrices applicable to men and women for personal hygiene items are not the same. (Bickham Decl. ¶ 30.)

Harrison complains that male inmates are not allowed to purchase certain clothing items, specifically women's New Balance shoes, colored T-shirts, bath robes, lightweight pants, relaxed fit jeans, kimono robes, and house slippers. (Pl.'s Compl., Doc. 1-1.) But because of significant safety concerns, particularly related to the use of various colors as gang symbols or signs of gang affiliation, males are permitted to purchase clothing items in gray or white only. (Bickham Decl. ¶ 33(a).) Gang members in male institutions frequently attempt to use colors, including colors on clothing, to demonstrate affiliation to their gang. (*Id*.) Dark colored items can be used to hide or camouflage at night aiding in an escape attempt. (*Id*.) COMPSTAT data shows that gang activity and escape risks are much higher at male institutions. (Bickham Decl. ¶¶ 17-19.)

Male inmates are not allowed to purchase bath robes or kimonos because their belts and cords can be used as strangulation weapons. (Bickham Decl. ¶ 33(c).) Substitutions and alternate products are allowed that allow the institutions to maintain institutional safety and security of the institution can be maintained. Male inmates are allowed to purchase men's tennis/sneaker shoes in white, white socks, jeans, and men's slippers and sandals in brown or white. (Bickham Decl. ¶ 33(b).)

Finally, the jewelry items Harrison requests are disallowed in male institutions to minimize disruptive and predatory behavior between inmates, where relatively weaker inmates are pressured into giving away items of personal property to inmates that are more predatory. (Bickham Decl. ¶ 34.) In prison, high value items are a form of currency, and widespread dissemination of high-value items can lead to gambling, gambling debts, and even violence. (*Id*.) Where possible, CDCR attempts to limit the amount of high-value items permitted in prison, especially where, as here, those items can be easily concealed from staff. (*Id*.) Male inmates are permitted one wedding band, not to exceed $100 in value, and one religious medallion. (*Id*.) In

9

addition to these items, female inmates are permitted a chain, necklace, or bracelet. (*Id.*) Again, these differences are based on COMPSTAT data showing a greater propensity for violence related to high-value and concealable property items in male prisons. (*Id.*)

## ANALYSIS

In his complaint, Plaintiff states his claim as follows:

> Defendants, Scott Kernan, Jeffrey Beard, and Does, 1-5, inclusive, have, and continue, to violate the Equal Protection Clause of the Fourteenth Amendment, of the United States Constitution, by imposing disparate personal property requirements between Plaintiff (male gender) and his similarly situated female counterparts of the same, and of greater, security risk classifications.
> This action challenges the process by which Defendants make their classification decisions - - decisionmaking process - - to prohibit Plaintiff from purchasing those vendor products the same and equal to vendor products allowed to similarly situated female prisoners, as well as allowed to those female prisoners of demonstrated greater security risk than Plaintiff.

(Doc. 1-1, at 5.)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005) (evidence of different treatment of unlike groups does not support an equal protection claim). Groups of individuals are "similarly situated" when their circumstances are "arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609 (1974); *Sturm v. Cal. Adult Auth.*, 395 F.2d 446, 448 (9th Cir. 1967) ("The equal protection clause of the Fourteenth Amendment requires only that state laws be applied uniformly to situations that cannot be reasonably distinguished.") Differing treatment of dissimilar groups does not violate the Equal Protection clause. *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1140 (9th Cir. 2011); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005) ("Evidence of different treatment of unlike groups does not support an equal protection claim.")

When challenging his treatment with regard to other prisoners, courts have held that in

order to present an equal protection claim a prisoner must allege that his treatment is invidiously dissimilar to that received by other inmates. *More v. Farrier*, 984 F.2d 269, 271-72 (8th Cir. 1993) (absent evidence of invidious discrimination, federal courts should defer to judgment of prison officials); *Timm v. Gunter*, 917 F.2d 1093, 1099 (8th Cir. 1990) (same). The first step in determining whether the inmate's equal protection rights were violated is to identify the relevant class of prisoners to which he belongs. *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013). The class must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified. *Id.* at 1031 (affirming district court's grant of defendants' motion for summary judgment because inmate failed to raise triable issue of fact that he was treated differently than any other inmate whom the officers did not know was entitled to a vegetarian meal).

Absent a threshold showing that a plaintiff is similarly situated to the allegedly favored group, the plaintiff has no equal protection claim. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1106 (9th Cir. Feb. 29, 2012); see also *Lumbreras v. Roberts*, 319 F. Supp. 2d 1191, 1213 (D. Or. 2004) (holding that plaintiff must make a threshold showing of substantial similarity).

In the present case, Plaintiff "challenges the process by which Defendants make their classification decisions - - decisionmaking process - - to prohibit Plaintiff from purchasing those vendor products the same and equal to vendor products allowed to similarly situated female prisoners, as well as allowed to those female prisoners of demonstrated greater security risk than Plaintiff." Complaint, Doc. 1-1 at 5. Plaintiff relies on footnote 4 from *Klinger v. Department of Corrections*, 31 F.3d 727 (8th Cir. 1994), in which the Eighth Circuit explained that "male and female inmates are similarly situated for purposes of the *process* by which the Department makes programming decisions."

There is nothing before this court indicating that male and female inmates were treated differently by CDCR during the process of creating the regulations to which Plaintiff objects. *See e.g.*, *Klinger*, 31 F.3d at note 4 (selecting vocational programs at men's prisons based on inmate surveys, but selecting such programs at women's prison without consulting the inmates makes a threshold showing that women were treated differently than others similarly situated). Here there

1   is no evidence that the information on which the CDCR based its decisionmaking was sought,

2   collected or analyzed in a way that discriminated based on gender.

3       In his Opposition to Defendants' Motion for Summary Judgment, Plaintiff contends that

4   the Constitutional issue before the court is "the classification decision - - decisionmaking process -

5   - determining Plaintiff to be more likely violent, predatory, etc., than every female prisoner in the

6   State of California." Opposition, Doc. 37 at 5. Here Plaintiff proceeds from a false premise, *i.e.*,

7   that the CDCR has made a determination that "Plaintiff, as a function of gender, is more likely

8   violent, predatory, etc., than every female prisoner." Opposition, Doc. 37 at 20. There is no

9   evidence before this court that CDCR has made such a determination. However, it is not per se

10  necessary for the CDCR to make individualized determinations as to the violent or predatory

11  nature of a particular inmate before imposing regulations on a group of inmates to which that

12  inmate belongs.

13      As stated above, the first step in determining whether an inmate's equal protection rights

14  were violated is to identify the relevant class of prisoners to which he belongs. *Furnace*, 705 F.3d

15  at 1030. The class must be comprised of similarly situated persons so that the factor motivating the

16  alleged discrimination can be identified. *Id.* at 1031. Here, Plaintiff claims that he is similarly

17  situated to female inmates of the same or greater risk classifications. But equal protection analysis

18  is based on <u>class</u>. Therefore, the analysis must be whether the Plaintiff's equal protection rights

19  are being violated because the CDCR has enacted differing Authorized Personal Property

20  Schedules for inmates in the same class. Plaintiff has identified that class as male inmates and

21  female inmates of the same or greater security classification. Thus, the question becomes whether

22  these two groups are similarly situated.

23      The court finds that male and female inmates are not similarly situated for several reasons.

24  First, male and female inmates are not housed together; in fact, they are assigned to entirely

25  different facilities. *See* California Department of Corrections and Rehabilitation, Prison Facilities,

26  http://www.cdcr.ca.gov/ Facilities_Locator/index.html (last visited Apr. 7, 2017) (containing links

27  to California's prisons, including the three women's facilities). Second, the facilities housing

28  female inmates are generally smaller than the facilities for male inmates, typically ranging from

12

about one-half to one-fifth the size of male facilities, creating different management needs. *See id*.

Additionally, female inmates exhibit substantially less dangerous behavior than male inmates. Since 1952, California inmates have killed twenty state correctional employees. California Department of Corrections and Rehabilitation, Employees Killed by Inmates (Jan. 2012), http://www.cdcr.ca.gov/reports_research/offender_information_services _branch/Annual/Beh5/BEH5d2011.pdf. None of those murders occurred at a women's prison. *Id*. From 1991 to 2000, male inmates' per capita rate of incidents involving battery were typically about two to three times the rates of females. California Department of Corrections and Rehabilitation, Inmate Incidents in Institutions, Calendar Year 2000 (Mar. 2001), http://www.cdcr.ca.gov/reports_research/offender_information_services_branch/Annual/BEH1/B EH1d2000.pdf. Not only is the incidence of violence higher among males, research has found that the degree of violence is higher as well. Miles D. Harer & Neal P. Langan, Gender Differences in Predictors of Prison Violence: Assessing the Predictive Validity of a Risk Classification System (2001), available at http://www.bop.gov/news/research_projects/ published_reports/equity_diversity/oreprharer.pdf.

These factors and the undisputed facts set forth above demonstrate that male and female inmates are not similarly situated under the Equal Protection Clause for the issues related to personal property within the CDCR's institutions. *See Keevan v. Smith*, 100 F.3d 644, 648-50 (8th Cir. 1996) ("male and female inmates incarcerated in Department prisons are far from similarly situated for purposes of equal protection analysis"); *Klinger v. Dep't Corrs.*, 31 F.3d 727, 732 (8th Cir. 1994) (holding that female inmates and male inmates were not similarly situated for purposes of prison programs) In managing prison populations, officials "must balance many considerations, ranging from the characteristics of the inmates at the prison to the size of the institution, to determine the optimal mix of programs and services." *Klinger v. Dep't Corrs.*, 31 F.3d 727, 732 (8th Cir. 1994). Because these factors are so different between male and female inmates, the two groups cannot be considered similarly situated for the purposes of prison programs and services. *Keevan*, 100 F.3d at 649; *Klinger*, 31 F.3d at 733. Having failed

to meet the required threshold of showing that he is treated differently than the similarly situated group at issue, Plaintiff has failed to establish an equal protection violation.

The court further finds that even if Plaintiff could show that male and female inmates are similarly situated for equal protection purposes, he still is not entitled to relief. It is well settled that courts must exercise judicial deference to the decisions of prison administrators. *Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner v. Safley*, the Court reiterated the need for judicial deference to the problems of prison administration, holding that when a prison regulation [or practice] impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. at 89. The Court set out four factors to be considered:

> (1) Whether there is a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it. A regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational, and the government objective must be a legitimate and neutral one.
> (2) Whether there are alternative means of exercising the right that remains open. If so, courts should be particularly conscious of the measure of judicial deference owed to corrections officials.
> (3) What impact the accommodation of the asserted right will have on guards, other inmates and the allocation of prison resources generally. If the accommodation will have a significant ripple effect the courts should be particularly deferential to the informed discretion of correctional officials.
> (4) If there is an absence of ready alternatives, this is evidence of the reasonableness of a prison regulation.

*See Id.* at 89-91.

Thus, the only proper standard for determining the validity of a prison regulation or practice claimed to infringe on an inmate's constitutional rights is to ask whether the regulation or practice is "reasonably related to legitimate penological interests." *Id.* at 89. This is true even when the constitutional right claimed to have been infringed is fundamental or a suspect class is involved, and the state under other circumstances would be required to satisfy a more rigorous standard of review. *Washington v. Harper*, 494 U.S. 210, 223-25 (1990) (standard of review adopted in Turner applies in all circumstances in which needs of prison administration implicate constitutional rights). The one exception is the right to racial equality. *Johnson*, 543 U.S. at 530-31 (holding that *Turner* does not apply to racial classifications in prison); *Harrington v. Scribner*,

785 F.3d 1299, 1306-07 (9th Cir. 2015) (emphasizing that the *Turner* deference does not trump strict scrutiny analysis for race-based prison equal protection challenges).

This court has previously determined that CDCR has shown a reasonable relationship between the restriction on male possession of earrings and security concerns. *See Gonzalez v. Mullen*, United States District Court, Northern District, Case No. 4:09-cv-00953-CW, Order Granting Defs.' Mot. Summ. J. and Mot. to File Sur-Reply, Doc. 68 at 9-10.) The court determined that property matrices providing different property at male and female correctional institutions are constitutionally sound because CDCR has determined that fewer acts of violence occur at female institutions as compared to male institutions. *Id.* at *5.

As discussed above, there are several legitimate penological bases for treating male and female inmates differently, including disparate violence levels, separate housing facilities, different population sizes at those facilities, and generally different management concerns. (*See* Bickham Decl. ¶¶ 5-22.) Inmates in the highest privilege groups are still subject to significant restrictions on items they may purchase in their quarterly packages, based on institutional safety and security concerns. (Bickham Decl. ¶ 9.) This is because inmates are not isolated, but live in a setting where several other inmates have access to other inmates' property. (*Id.*) Therefore, even if an inmate is deemed to be in the highest privilege group, his items will still be limited based on his current housing, specifically to ensure that other inmates do not gain access to items that can be used illegally or in violation of CDCR policy. (*Id.*)

Harrison lives in the general population among other male inmates. Therefore, even if he is not himself violent, predatory, or an escape risk, he is still at risk from predatory or violent behavior by other inmates who may be a threat or risk to public safety. (Bickham Decl. ¶ 23.) Because it is clearly established that male institutions are subject to greater threats of violence and rules violations than female institutions, CDCR has appropriately enacted reasonable restrictions on specific property items. CDCR is entitled to deference in its determination that certain items pose threats to the safety and security of the institutions. Under the undisputed facts regarding the realities of life in male institutions, there is no reasonable alternative to restricting the personal property allowed to male inmates. Thus, under the *Turner*

analysis, the court must conclude that Plaintiff cannot show an equal protection violation.

Having found no genuine issues of material fact, and having concluded that Defendants are entitled to judgment as a matter of law, the court will enter summary judgment in Defendants' favor.

## DISCOVERY ISSUES

Harrison opposes Defendants' summary-judgment motion on the premise that he has not received discovery responses. A party requesting a continuance under Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment. *See* Fed. R. Civ. P. 56(f); *California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998); *see also* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2740 (3d ed. 1998) ("when the movant has met the initial burden required for the granting of a summary judgment, the opposing party either must establish a genuine issue for trial under Rule 56(e) or explain why he cannot yet do so under Rule 56(f)"). Merely asserting the need for discovery in an opposition will not defeat summary judgment. At minimum, a plaintiff must comply with Rule 56(f) and, by affidavit filed in conjunction with his opposition, show the particular facts he expects to discover and how those facts would preclude summary judgment. *See Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 523-24 (9th Cir. 1989). Harrison has not done this, but instead generally asserts a need for further discovery without specifying anything that if discovered would preclude summary judgment. Harrison admits that he seeks additional discovery not to oppose the motion for summary judgment, but to ascertain the names of "Does" Defendants. (Pl.'s Opp. Doc. 37-1 at 17.) He does not, however, refer to any specific fact or explain why names of Doe Defendants are essential to his opposition to the motion for summary judgment. Accordingly, the court finds that Plaintiff has not established a basis for a continuance under Rule 56(f).

//

//

//

//

Based on the foregoing, IT IS HEREBY ORDERED as follows:

1) Plaintiff's request to conduct further discovery is DENIED;

2) Plaintiff's motion for summary judgment is DENIED;

3) Defendants' motion for summary judgment is GRANTED.

A separate judgment will issue.

**IT IS SO ORDERED**.

Dated: August 21, 2017

_____
NANDOR J. VADAS
United States Magistrate Judge