UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DAVID SCOTT HARRISON,<br><br>    Plaintiff,<br><br>v.<br><br>S. KERNAN, *et al.*,<br><br>    Defendants. | Case No. 16-cv-07103-RMI<br><br>**ORDER RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 70 |

Now pending before the court is Defendants' Motion for Partial Summary Judgment (dkt. 70), seeking summary judgment on qualified immunity grounds in favor Defendants Kernan and Beard (as to Plaintiff's claims suing them in their individual capacities for the purposes of Plaintiff's damages claim). Plaintiff has responded (dkt. 71), and Defendants have replied (dkt. 72). For the reasons stated below, Defendants' Motion is granted.[1]

**BACKGROUND**

This case is once again before this court on remand from the Court of Appeals. *See* Op. (dkt. 57). Plaintiff, a California state prisoner, sued two now-former secretaries of the California Department of Corrections and Rehabilitation ("CDCR") pursuant to 42 U.S.C. § 1983 and alleged that Defendants discriminated against him on the basis of his male gender by promulgating rules that prohibited him from purchasing certain products from prison vendors that were only available to women prisoners under a series of rules that were proposed in 2007 and finalized in 2008. *See id.* at 4-5.[2] Plaintiff initially filed his case in state court and sued Defendants in their

---

[1] Pursuant to Civil Local R. 7-1(b), the court finds that this matter is suitable for disposition without oral argument.

[2] Plaintiff's Complaint does not describe any specific list of items he wishes to purchase, instead, he attached materials to his Complaint that show which items are available for purchase only by women prisoners. *See generally* Compl. (dkt. 1-1). Examples of those items include: bath robes; jewelry; hair

1    individual capacities for the purposes of his claim seeking damages, and in their official capacity
2    for the purposes of his claim for injunctive relief. *See* Compl. (dkt. 1-1) at 15-18. Subsequently,
3    Defendants removed the case to this court (*see* dkt. 1) and moved for summary judgment (dkt. 23)
4    arguing, *inter alia*, that for equal protection purposes: (1) male and female prisoners are not
5    similarly situation; and, (2) differences in access to personal property items are reasonably related
6    to legitimate penological interests, and that the property restrictions were constitutionally sound
7    because they satisfy the four-factor test set forth in *Turner v. Safley*, 482 U.S. 78 (1987) (to wit:
8    whether there is a valid, rational connection between the prison regulation and the legitimate
9    government interest advanced as a justification; whether there are any alternative means of
10   exercising the right; the impact that the accommodation of the right will have on guards, other
11   prisoners, and the allocation of prison resources; and, in the absence of ready alternatives, the
12   reasonableness of the prison regulation). *See* Defs.' First. Mot. (dkt. 23) at 16-20.

13        In August of 2017, the Honorable Nandor J. Vadas granted Defendants' motion on grounds
14   that "the only proper standard for determining the validity of a prison regulation or practice
15   claimed to infringe on an inmate's constitutional rights [with the exception of race-based
16   discrimination claims and alleged Eighth Amendment violations] is to ask whether the regulation
17   or practice is 'reasonably related to legitimate penological interests.'" *See Order of August 21,*
18   *2017* (dkt. 48) at 14 (citing *Turner*, 482 U.S. at 89). Judge Vadas then added that "[t]his is true
19   even when the constitutional right claimed to have been infringed is fundamental or a suspect class
20   is involved, and the state under other circumstances would be required to satisfy a more rigorous
21   standard of review. *Id*. (citing *Washington v. Harper*, 494 U.S. 210, 223-25 (1990) ("We made
22   quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which
23   the needs of prison administration implicate constitutional rights."). In short, Judge Vadas
24   concluded that the rules prohibiting male prisoners from possessing these items were reasonably
25   related to legitimate penological purposes and that "under the *Turner* analysis, the court must

27   dryers; fruit-flavored instant oatmeal; trail mix; hot salsa; a certain card game known as "Uno"; tomato ketchup; Casio watches; certain types of jeans; certain types of candies known as "Abba Zaba bars, Jolly
28   Ranchers, caramels, Laffy Taffy, mints, [and] Swedish Fish"; Q-tips and cotton swabs; certain types of soaps and face washes; toothbrush cases; and bath sponges. *See* Pl.'s Opp. (dkt. 71) at 6.

1    conclude that Plaintiff cannot show an equal protection violation." *See id*. at 15-16.

2        Plaintiff appealed (dkt. 50) and in August of 2020, the Court of Appeals issued an opinion
3    vacating Judge Vadas's order granting summary judgment under *Turner*'s "reasonably related"
4    standard, while explaining: "we [now] conclude that intermediate scrutiny applies to such claims
5    [and] [b]ecause we had not yet established intermediate scrutiny as the applicable standard at the
6    time the district court reviewed the regulation at issue in this case, we follow our normal practice
7    of remanding to the district court to determine in the first instance whether Defendants have met
8    the standard we outline today." *See* Op. (dkt. 57) at 3-4. The appellate court also made certain to
9    note that, "[g]iven that no prior Ninth Circuit precedent addressed the appropriate standard of
10   scrutiny afforded to gender-based equal protection claims in the prison context, we cannot fully
11   fault the district court for applying the deferential *Turner* standard advanced by the Department
12   below." *Id*. at 15 n.10. The court also noted that this issue has been the subject of considerable
13   disagreement amongst jurists: "[o]ther circuits have not yet decided this question, or else have not
14   yet taken the opportunity to address it again after the Supreme Court offered additional guidance
15   in *Johnson v. California*." *Id*. at 19 n.12 (noting that in 2001, one panel of the Fourth Circuit Court
16   of Appeals affirmed without comment a district court's application of intermediate scrutiny to
17   such a claim, but then, "two years later applied *Turner*'s reasonableness standard to another such
18   claim in a published opinion," while the Fifth Circuit Court of Appeals has expressly declined to
19   decide the question of the proper standard with which to address such claims). In any event, given
20   the changing landscape governing the standard by which gender-based equal protection claims in
21   the prison context are evaluated, the Court of Appeals made certain to include the following
22   instruction in its mandate on remand: "[t]he district court also should decide, in the first instance,
23   whether Defendants Kernan and Beard in their individual capacities are entitled to qualified
24   immunity from Harrison's claims." *Id*. at 22 n.13.

25        Following Judge Vadas's retirement while this case was pending in the Court of Appeals,
26   after remand, the case was reassigned to the undersigned (dkt. 63) for further proceedings.
27   Thereafter, Defendants moved for partial summary judgment (dkt. 70) in relation to Plaintiff's
28   individual capacity claims, on qualified immunity grounds. Having been fully briefed, that motion

3

is now ripe for adjudication.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id*. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, a court will draw all reasonable factual inferences in favor of the non-movant. *Id*. at 255. In deciding summary judgment motions, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. However, conclusory or speculative testimony or allegations do not raise genuine issues of fact and are insufficient to defeat summary judgment. *See e.g., Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (internal quotation marks and brackets omitted). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mendez v. County of Los Angeles*, 815 F.3d 1178, 1186 (9th Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), overruled on other grounds by *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 198 L. Ed. 2d 52 (2017)). In order "[t]o

4

determine whether an officer is entitled to qualified immunity, [the Court] ask[s], in the order [it] choose[s], (1) whether the alleged misconduct violated a [constitutional] right and (2) whether the right was clearly established at the time of the alleged misconduct." *Hernandez v. City of San Jose*, 897 F.3d 1125, 1132 (9th Cir. 2018) (quoting *Maxwell v. County of San Diego*, 708 F.3d 1075, 1082 (9th Cir. 2013)) (alterations in *Hernandez*); *see also Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (same). Lastly, it is important to note that qualified immunity applies unless the answer to both questions is "yes." *See Pearson*, 555 U.S. at 232.

## DISCUSSION

Defendants move for summary judgment on Plaintiff's damages claims against Defendants in their individual capacities because they contend that they are entitled to qualified immunity under the "clearly established law" prong of the analysis. *See* Defs.' Mot. (dkt. 70) at 5. Defendants' qualified immunity argument is based on the following foundation: (1) it was not until Plaintiff took an appeal from a summary judgment order <u>in this case</u> that the Court of Appeals for the Ninth Circuit announced "that prison regulations that facially discriminate on the basis of gender are subject to intermediate scrutiny and not the deferential *Turner* standard"; and, (2) that the court should not even bother evaluating the current regulations under the newly announced standard (for the purposes of this motion) because Defendants are entitled to qualified immunity under the "clearly established prong" of the analysis, and also because the property regulations now being challenged are in the process of being superseded by new regulations. *Id*. at 7.

Plaintiff responds to the effect that, even before the issuance of the opinion of the appellate court in this case, "[i]t was not reasonable for Defendants, as Secretaries of the [CDCR], to believe that prison regulations which discriminate on the basis of gender would be subject to *Turner*'s deferential standard." Pl.'s Opp. (dkt. 71) at 9. In essence, Plaintiff contends that Defendants should have been able to anticipate the appellate court's decision (issued in August of 2020) as early as 2007 and 2008, when the challenged regulations were proposed and enacted. As a basis for this contention, Plaintiff maintains that "[t]he Ninth Circuit has been applying intermediate scrutiny to prisoners' gender-discrimination claims well before its decision in this case." *Id*. at 10-

5

11 (citing *Laing v. Guisto*, 92 F. App'x 422, 423 (9th Cir. 2004); *Goldyn v. Angelone*, No. 97-17185, 1999 U.S. App. LEXIS 22986, at *5 (9th Cir. Sep. 16, 1999); and, *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1139-40 (9th Cir. 2011)).[3] Plaintiff also submits that certain cases from other circuits, as well as a few district court opinions, "clearly established the Department's property schedule would be evaluated under intermediate scrutiny." Pl.'s Opp. (dkt. 71) at 11-14.

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), overruled on other grounds by *Pearson*, 555 U.S. at 245). In applying the two-part qualified immunity analysis, courts "must determine whether, taken in the light most favorable to [Plaintiffs], Defendants' conduct amounted to a constitutional violation, and . . . [then] determine whether or not the right was clearly established at the time of the violation." *McSherry v. City of Long Beach*, 560 F.3d 1125, 1129-30 (9th Cir. 2009). It is within this court's "sound discretion [to] decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Because qualified immunity applies unless the answer to both questions is "yes" (*see Pearson*, 555 U.S. at 232), and because the court can evaluate the two prongs in any order it chooses, if the court finds that the "clearly established prong" is not satisfied here, then there is no reason to render an analysis as to whether the 2008 property regulations violated Plaintiff's rights under the intermediate scrutiny approach that was announced in August of 2020.

Under the second prong of the qualified immunity test, in the present context, this court

---

[3] For the reasons discussed below, Plaintiff's reliance on the unpublished opinions in *Laing* and *Goldyn*, as well as Plaintiff's reliance on the published opinion in *Byrd*, is unavailing as those cases do not clearly establish the proposition for which they are cited. However, as mentioned, the challenged regulations were enacted in May of 2008 (*see* Op. (dkt. 57) at 5), therefore, even if *Byrd* stood for the proposition for which it is cited, which is not the case, the simple fact that the opinion in *Byrd* was filed in 2011 renders it irrelevant for purposes of qualified immunity analysis for events occurring three years earlier. *See e.g.*, *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (*en banc*), cert. denied, 137 S. Ct. 831 (Jan. 23, 2017) (qualified immunity looks at whether the right was clearly established when the defendant acted). In any event, contrary to Plaintiff's contention that the appellate court had previously announced or applied an intermediate scrutiny standard in *Byrd* in 2011 – to put in the appellate court's own phrasing, *Byrd* had only "hinted at the applicability of the intermediate scrutiny standard to gender-based equal protection claims in prisons and jails." *See Harrison v. Kernan*, 971 F.3d 1069, 1078 (9th Cir. 2020).

6

must determine whether or not the standard for evaluating the constitutional soundness of the property regulations in question was clearly established at the time of the Defendants' alleged misconduct. *See S. B. v. Cnty. of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017). "If not, the officer[s] receive[] qualified immunity." *Id*. In order for a standard to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While courts "do not require a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*per curiam*) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In other words, for a standard to have been clearly established – hints, conflicting and inconsistent decisions, or mixed-messages simply will not do, the question must be "beyond debate." *See Ashcroft v. al-Kidd*, 563 U.S. at 741. The Supreme Court has explained that this "clearly established" standard preserves an appropriate balance between two important interests: the vindication of constitutional rights on one hand, and affording government officials sufficient latitude to effectively perform their duties by ensuring that they are able to reasonably anticipate when their conduct may give rise to liability for damages. *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

Lastly, "[a]lthough disagreement among circuit courts may imply a legal principle is not 'beyond debate,' and thus not clearly established, qualified immunity is not [necessarily] the 'guaranteed product of disuniform views of the law in the other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear' . . . however, '[i]f the right is clearly established by decisional authority of the Supreme Court or of this Circuit, our inquiry should come to an end.'" *Carrillo v. Cnty. of L.A.*, 798 F.3d 1210, 1222-23 (9th Cir. 2015) (quoting *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 378 (2009); and, *Hopkins v. Bonvicino*, 573 F.3d 752, 772 (9th Cir. 2009)). Only in the absence of binding precedent do courts look to other sources of decisional law such as out-of-circuit cases, or decisions from other district courts. *See Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004).

Turning to Plaintiffs arguments, the court will first address Plaintiff's suggestion to the

7

effect that "[t]he Ninth Circuit has been applying intermediate scrutiny to prisoners' gender-discrimination claims well before its decision in this case." Pl.'s Mot. (dkt. 71) at 10-11. Plaintiff's first citation in this regard is to the unpublished memorandum opinion in *Laing*, 92 F. App'x at 423, in which Plaintiff contends that the court applied "heightened scrutiny to [an] equal-protection challenge to [a] jail policy allowing female guards to conduct pat-down searches of male inmates." Pl.'s Mot. (dkt. 71) at 10. The court agrees that the *Laing* court did appear to imply that it might approve of an intermediate scrutiny standard by stating that "[t]he district court properly concluded that the jail policy did not violate Laing's equal protection rights because Laing failed to provide evidence sufficient to overcome the defendant's showing that the cross-gender searches serve important government objectives, and that its means are substantially related to the achievement of those objectives" (*see Laing*, 92 F. App'x at 423); however, this statement can hardly qualify as clearly mandating intermediate scrutiny for the evaluation of all gender-based equal protection claims in the prison context. Further, the decision in *Laing* also turned on the holding that "Laing also failed to show that male inmates are similarly situated to females with respect to intimate bodily searches by guards of the opposite sex." *Id*. Accordingly, *Laing* did not, by any means, put the question of what standard applies to Plaintiff's challenge to the property regulations at issue "beyond debate."

Plaintiff's reliance on *Goldyn*, No. 97-17185, 1999 U.S. App. LEXIS 22986, at *5, is similarly unpersuasive. Plaintiff's suggestion that *Goldyn* stands for the proposition that intermediate scrutiny applies to all gender-based equal protection claims in the prison context is seriously undermined by several facts. First, it should not go without mention that *Goldyn* specifically cited to *Turner* when stating that "[p]risoners retain the protections of the Equal Protection Clause upon incarceration," meaning that the *Goldyn* panel would have applied the deferential *Turner* standard had it even reached the merits of the appellant's challenge to "the overall [standards for] provision of educational and job opportunities provided to male and female inmates in the Nevada state prison system"; instead, the *Goldyn* court resolved the appeal on a number of procedural grounds, including the fact that the appellant had failed to oppose summary judgment and had also "failed to present evidence of defendants' intentional, gender-based

discrimination." *Id*. at \*6. Therefore, it cannot be contended that *Goldyn* or *Laing* demonstrate that "[t]he Ninth Circuit has been applying intermediate scrutiny to prisoners' gender-discrimination claims well before its decision in this case." *See* Pl.'s Mot. (dkt. 71) at 10-11.

Plaintiff's reliance on *Byrd* is similarly misplaced to an even greater degree. As mentioned, *Byrd* was decided more than 3 years after the enactment of the regulations at issue in this case, rendering it immaterial for qualified immunity purposes. *See e.g., S.B.*, 864 F.3d at 1015 (qualified immunity looks at whether the right was clearly established when the defendant acted). Then there is the fact *Byrd* disposed of the appellant's equal protection claim as such: "[e]ven construing Byrd's *pro se* complaint liberally, the allegations failed to state an equal protection claim because they asserted only allegedly harmful treatment and mentioned nothing about disparate treatment, much less about the specific jail policy or gender classification in general . . . [and] [f]or that reason, we do not take issue with the ultimate ruling dismissing Byrd's equal protection claim." *Byrd*, 629 F.3d at 1140. While Plaintiff is correct that, in dicta, *Byrd* appears to make certain references to other cases that applied a "heightened review standard to statutes containing a 'gender-based classification on their face,'" it cannot be reasonably contended that *Byrd* even applied – let alone clearly established – an intermediate scrutiny standard for all gender-based equal protection claims in the prison context because nowhere in *Byrd* was that "heightened review standard" described or announced as generally applicable to all gender-based discrimination claims in the prison context. *See id*. at 1139-40. Lastly, Plaintiff's suggestion that "[t]he Ninth Circuit has been applying intermediate scrutiny to prisoners' gender-based discrimination claims well before its decision in this case" (*see* Pl.'s Mot. (dkt. 71) at 10) is undermined by the Ninth Circuit's pronouncement, in this case, to the effect that since "no prior Ninth Circuit precedent addressed the appropriate standard of scrutiny afforded to gender-based equal protection claims in the prison context, we cannot fully fault the district court for applying the deferential *Turner* standard advanced by the Department below." *See Harrison*, 971 F.3d at 1081 n.10. This begs a rhetorical question – if the appellate court was unable to fault this court for applying *Turner*'s standard, then how could this court fault Defendants for promulgating regulations based on *Turner*'s standard?

9

Regarding Plaintiff's argument regarding cases from other circuits, those arguments are similarly unpersuasive. As the Court of Appeals noted in this case, the state of the law as to what standard has been applicable to gender-based discrimination claims in the prison context has been unsettled to say the least. In this case, when the Ninth Circuit noted that "[b]y declaring the applicable standard of scrutiny today, we join the Eighth and D.C. Circuits, which have already adopted intermediate scrutiny in gender-based prison cases." *See id*. at 1078-79. The appellate court also added that, in published opinions, the Fifth and Sixth Circuit Courts of Appeal had expressly avoided deciding the appropriate level of scrutiny for such claims; and, after affirming a district court's application of intermediate scrutiny to such a claim in an unpublished opinion, the Fourth Circuit reversed course in 2002 and applied *Turner*'s reasonableness standard in a published opinion. *See id*. at 1078-79, n.12. Notably, the Eighth Circuit case mentioned above was decided in 2009, a year after the enactment of the regulations in this case – rendering it similarly immaterial for qualified immunity purposes. *See id*. at 1078 (citing *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966 (8th Cir. 2009)).

Before the issuance of the Ninth Circuit's opinion in this case, however, a review of the overwhelming bulk of the precedent in this circuit describing the applicable standard to prison-based discrimination claims (on various bases with the exception of race-based discrimination) reveals nothing resembling the clarity that Plaintiff suggests to be the case. For example, four years before the prison regulations at issue in this case were proposed, and five years before they were enacted, the Ninth Circuit unambiguously stated that "[i]n the prison context, however, even fundamental rights such as the right to equal protection are judged by a standard of reasonableness – specifically, whether the actions of prison officials are 'reasonably related to legitimate penological interests.'" *Walker v. Gomez*, 370 F.3d 969, 974-75 (9th Cir. 2004) (quoting *Turner*, 482 U.S. at 89). Several years earlier, in a case where male corrections officers had sued the state and the correctional center director, alleging that they had improperly discriminated against them on the basis of their gender by assigning only female officers to certain posts, the Ninth Circuit applied *Turner*'s deferential standard and explained that, "[a]fter a study conducted by a specially appointed task force in compliance with an EEOC settlement agreement, prison officials

10

1  authorized by the Department of Personnel Services determined that the best policy to protect
2  female inmates and to prevent allegations of sexual misconduct was to designate six posts as
3  female-only. This professional judgment is entitled to deference." *Robino v. Iranon*, 145 F.3d
4  1109, 1110 (9th Cir. 1998) (citing *Turner*, 482 U.S. at 89).

5  Five years earlier, in a case involving both equal protection and Eighth Amendment issues
6  relating to the implementation of a policy at a women's correctional facility requiring male guards
7  to randomly conduct non-emergency clothed body searches of female prisoners, the appellate
8  court explained that due process and equal protection (to which it stated *Turner*'s standard applies)
9  were distinguishable from Eight Amendment claims because "Eighth Amendment rights do not
10 conflict with incarceration; rather, they limit the hardships which may be inflicted upon the
11 incarcerated as 'punishment.'" *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993) (citing
12 *Washington*, 494 U.S. at 224 ("We made quite clear that the standard of review we adopted in
13 *Turner* applies to all circumstances in which the needs of prison administration implicate
14 constitutional rights.")). Thus, the *Jordan* court clearly explained that "*Turner* has been applied
15 only where the constitutional right is one which is enjoyed by all persons, but the exercise of
16 which may necessarily be limited due to the unique circumstances of imprisonment." *Jordan*, 986
17 F.2d at 1530.

18  While Plaintiff claims that Defendants, as department heads, ought to have known better
19 than to promulgate regulations pursuant to *Turner* in 2008 because of the existence of a handful of
20 district court cases and circuit court cases from elsewhere in the country, the court finds that this
21 approach places an unfair burden on Defendants. Plaintiff's approach would have required
22 Defendants to ignore a wealth of authority from the Ninth Circuit (as detailed above), through
23 which the appellate court had repeatedly pronounced, in published opinions, that *Turner*'s
24 deferential standard was applicable to nearly all constitutional claims arising in the prison context,
25 including equal protection claims. The sort of clairvoyance that Plaintiff appears to demand from
26 Defendants is inconsistent with the "beyond debate" standard for the "clearly established" prong
27 of qualified immunity analysis. In short, the court finds that the intermediate scrutiny standard for
28 evaluation gender-based equal protection claims in the prison context was not clearly established

11

until the appellate court's pronouncement to that effect in the course of this case – thus, entitling Defendants to qualified immunity under the standards described above.

To recapitulate, because the now-applicable intermediate scrutiny standard for evaluating Plaintiff's equal protection challenge to the property regulations at issue was not clearly established at the time that Defendants promulgated and enacted those regulations in 2008, Defendants are entitled to qualified immunity because it would be unfair to hold their conduct accountable to a standard that would not be announced until a dozen years after the time they promulgated regulations that, when enacted, satisfied the then-applicable *Turner* standard. Furthermore, because out-of-circuit cases in 2008 provided little (if any) guidance to CDCR officials regarding the application of intermediate scrutiny, as opposed to *Turner*'s deferential standard, and since "no prior Ninth Circuit precedent addressed the appropriate standard of scrutiny afforded to gender-based equal protection claims in the prison context," (*see Harrison*, 971 F.3d at 1081 n.10), it would be unfair to fault Defendants for promulgating regulations that were formulated pursuant to a standard that no one could reasonably dispute was in effect and applicable in 2008.

## CONCLUSION

Given the state of the law as described above, and given that qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law," it would be impossible for Plaintiff to even prove that Defendants' promulgation of the challenged regulations was mistaken in 2008, let alone proving that Defendants were either incompetent or knowingly violated the law. *See Sheehan*, 575 U.S. at 611. Accordingly, for the reasons stated herein, Defendants' Motion for Partial Summary Judgment (dkt. 70) is **GRANTED**.

**IT IS SO ORDERED.**

Dated: September 21, 2021

ROBERT M. ILLMAN
United States Magistrate Judge